**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2054
_____

UNITED STATES OF AMERICA

v.

JAMIL MURRAY,
a/k/a Smooth
a/k/a Mills

Jamil Murray,
Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE EASTERN DISTRICT OF PENNSLYVANIA
(D.C. Crim. No. 2-12-cr-00585-001)
District Judge:  Honorable Mitchell S. Goldberg
_____

Submitted Under Third Circuit LAR 34.1(a)
April 6, 2016
_____

Before: FISHER, RENDELL and BARRY, *Circuit Judges*

(Opinion Filed: April 28, 2016)
_____

Brian J. Zeiger, Esq
Levin & Zeiger
1500 John F. Kennedy Boulevard
Suite 620

Philadelphia, PA 19102

*Counsel for Appellant*

Anita Channapati, Esq.
United States Department of Justice
Criminal Division, Appellate Section
601 D Street, N.W.
Washington, D.C. 20530
        -AND-
Paul G. Shapiro, Esq.
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        -AND-
Sherri A. Stephan, Esq.
Office of the United States Attorney
504 West Hamilton Street
Suite 3701
Allentown, PA 18101

*Counsels for Appellee*

_____

OPINION OF THE COURT
_____

BARRY, *Circuit Judge*

Jamil Murray entered a plea of guilty to drug distribution offenses, pursuant to a plea agreement that preserved his right to appeal the denial of his motion to suppress. He now appeals the denial of that motion, arguing that the District Court erred when it failed to suppress evidence that law enforcement officers obtained as a result of their entry into a motel room that he had rented, but that was occupied by a third party. Because the Court correctly concluded that the officers did not violate the Fourth

2

Amendment when they entered the motel room or when they frisked Murray upon his entry into the room, and because the Court's factual findings with respect to consent were not clearly erroneous, we will affirm.

I.

The facts as found by the District Court are as follows. On August 16, 2010, Officer David Clee of the Bensalem Township Police Department was investigating a report of suspected prostitution at the Sunrise Motel, one of a series of motels along Route 1 in Bensalem. An owner told Officer Clee that he believed prostitution was taking place in his motel, and that he had seen a woman he believed to be a prostitute being picked up by a green Cadillac. Later that day, Officer Clee learned that a "tip" had been called in by a woman named "Jessica Brown," stating that a man named "Mills" was at the nearby Knights Inn, was in possession of drugs, and was driving a green Cadillac.

That evening, at approximately 9:00 p.m., Officer Clee and Corporal Adam Schwartz observed a green Cadillac parked outside another nearby motel, the Neshaminy Motor Inn. They learned that the car was registered to Room 302, which had been rented by one Jamil Murray. The officers knew, from their investigation of the "tip" earlier in the day, that Murray had rented two rooms at the Knights Inn, Rooms 157 and 158, paying cash, and they had seen a copy of Murray's driver's license on file at the Knights Inn.

Corporal Schwartz knocked on the door to Room 302. A woman wearing lingerie (later identified as Jessica Burns) answered the door, and asked Schwartz if he was "looking for a date." He responded "no." The officers then proceeded to the Knights Inn, where they saw the green Cadillac parked in front of Room 158. They observed a woman leaving Room 158, and saw Murray inside the room.

The officers returned to the Neshaminy Motor Inn, and Corporal Schwartz again knocked on the door to Room 302. Burns told him that she was busy, and to go away. Officer

Clee then knocked, and when Burns told him, too, that she was busy, he identified himself as a police officer and asked her to open the door. He also knocked on the window, and showed his badge to Burns through the window. She opened the door.

The officers asked if they could come in, and Burns allowed them to do so. Burns told the officers that she was a prostitute and that she worked for the person who had rented the room, a drug dealer that provided her with drugs. Although she did not then tell the officers, she later testified that she had made the earlier 911 call using the alias "Jessica Brown," and that she had called because she felt she was in danger.

While the officers were interviewing Burns, there was a knock at the door. Believing that it was another police officer, the officers allowed the door to be opened. Murray, whom the officers recognized from their investigation, came into the room. Corporal Schwartz patted him down, and Murray allowed the officers to remove items from his pockets and a lanyard from around his neck. They found a cell phone, a large sum of cash, and hotel room keys that, it was later determined, were keys to Rooms 157 and 158 at the Knights Inn. Murray attempted to flee, but was ultimately arrested.

The evidence that the officers obtained from Room 302—Burns' statements and the evidence taken from Murray's person—were used to obtain search warrants, including warrants for searches of Rooms 157 and 158 at the Knights Inn, and the Cadillac. In Room 157, officers found 192.4 grams of crack cocaine.

II.

Murray was charged in a superseding indictment with conspiracy to distribute 280 grams or more of crack cocaine, possession of crack cocaine, and other offenses. He moved to suppress the evidence that resulted from the encounter in Room 302 and argued that the evidence seized from Room

4

157 and pursuant to other warrants should also be suppressed as "fruit of the poisonous tree."

At the suppression hearing, Burns testified that she had no problem with the officers entering the room, and that she was "happy that they came and that they [were] there" and "wanted to open the door" because she had called earlier for help. Murray testified that he was not asked for, and did not provide, consent to the removal of items from his person.

The District Court denied Murray's motion, finding Burns' testimony to be credible and determining that she had common authority, or, in the alternative, apparent authority, to consent to the officers' entry into Room 302, and that her consent was voluntary. The Court also found that the frisk of Murray was lawful and supported by reasonable suspicion that he was armed and dangerous, and that he consented to the seizure of items from his person. It determined, as well, that the warrants obtained for other locations were based on probable cause and did not include evidence that had been unlawfully obtained.

On the eve of trial, Murray entered a plea of guilty to the drug-related offenses pursuant to a plea agreement. In the agreement, the government agreed to dismiss the remaining charges, and Murray preserved his right to appeal the denial of his suppression motion. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the government agreed to recommend a sentence of 240 months' imprisonment, followed by 120 months' supervised release. At sentencing, the District Court imposed the recommended sentence. This appeal followed.

III.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291. *United States v. Golson*, 743 F.3d 44, 50 (3d Cir. 2014). "We review the District Court's denial of a motion to suppress for clear error as to the underlying factual

determinations but exercise plenary review over the District Court's application of law to those facts." *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011).

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact," *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), which we review for clear error. *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003). A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see United States v. Lowe*, 791 F.3d 424, 427 (3d Cir. 2015).

IV.

On appeal, Murray contends that Burns lacked common or apparent authority to grant access to Room 302, and was coerced into doing so. He also contends that the officers illegally frisked him and that any consent to the seizure of evidence from his person was coerced. He, thus, concludes and argues to us that Burns' statements, the evidence seized from his person, and the evidence seized at the other locations, was all "fruit of the poisonous tree" flowing from the officers' unlawful entry into Room 302.

A.      Consent to Enter Room 302

"When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (citing *United States v. Jones*, 132 S. Ct. 945, 950 n.3 (2012)). Here, although the officers did no more than enter Room 302 and speak with Burns, we analyze their conduct as a "search" for purposes of the Fourth Amendment because they were gathering information in an area in which Murray had a legitimate

expectation of privacy, and did so "by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted" by him. *See id.* (holding that bringing a drug-sniffing dog onto a homeowner's porch constituted a search). The District Court found, and the parties do not dispute, that Murray had a legitimate expectation of privacy in Room 302. *See Stoner v. California*, 376 U.S. 483, 490 (1964).

While the Fourth Amendment prohibits unreasonable searches and seizures, "[c]onsent is an exception to the 'requirements of both a warrant and probable cause.'" *Stabile*, 633 F.3d at 230 (citing *Schneckloth*, 412 U.S. at 219). "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1973). This concept of "common authority" rests on the principle that one "assume[s] the risk" that a co-inhabitant "might permit the common area to be searched." *See id.* at 171 n.7. "Common authority" is defined as "mutual use of the property by persons generally having joint access or control for most purposes." *Id.*; *Stabile*, 633 F.3d at 230-31. When an individual possesses only apparent, rather than actual, common authority, the Fourth Amendment is not violated if the police officer's entry is "based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not do so." *Illinois v. Rodriguez*, 497 U.S. 177, 179, 188-89 (1990).

The District Court correctly concluded that Burns had common authority over Room 302 or, in the alternative, apparent authority. The facts as known to the officers at the time they entered Room 302 warranted a reasonable belief that Burns was a prostitute who had access to and control over the room for most purposes. Earlier, she had asked Corporal Schwartz if he was "looking for a date," and prior to the officers identifying themselves as law enforcement, she denied them entry to the room, saying that she was "busy."

7

(*See* App. 4.)  It was reasonable for the officers to believe that Burns was in control of who would be permitted to enter the room, a belief reinforced by the fact that, later, Murray knocked before entering.

The fact that the officers knew the room was registered to Murray does not render Burns' consent invalid, because she had common authority—or, at a minimum, apparent authority—over the room.  *See*, *e.g.*, *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008) (consent to search hotel room was valid when one co-occupant consented); *United States v. Rodriguez*, 414 F.3d 837, 844 (8th Cir. 2005) (consent to search motel room was valid when defendant's girlfriend consented, although defendant had registered and paid for the room); *United States v. Morales*, 861 F.2d 396, 399-400 (3d Cir. 1988) (consent to search car was valid when provided by the driver, although the car had been leased by another person who was present, but silent). When Murray granted Burns access to and control of Room 302, he assumed the risk that she could—and would—permit others, including law enforcement, to enter the room when he was not present.[1]

Murray argues that Burns was coerced into opening the door and permitting the officers to enter Room 302.  We conclude, however, that the District Court did not clearly err

---

[1] Murray attempts to analogize the facts of this case to those in which an employee, such as a housekeeper, babysitter, or handyman, is present in an employer's home to perform specific work, with only temporary access to and control over the premises.  This case, of course, involves neither a home nor an ordinary household employee.  The nature of Burns' employment pre-supposed that she would allow third parties to enter the room, and the facts known to the officers—including evidence that Murray was involved with prostitution-related activities at two other nearby hotels—made it reasonable for them to believe that Murray had granted Burns access to and control over the room for the purpose of engaging in prostitution.

in finding that Burns voluntarily consented to the officers' entry, in light of her testimony that she willingly allowed them to enter, was "happy that [the police] came and that they [were] there," and "wanted to open the door."

B.      Frisk and Seizure of Items from Murray

Citing longstanding precedent, the Supreme Court acknowledged in *Terry v. Ohio* that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." 392 U.S. 1, 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). Nevertheless, in *Terry*, the Court held that an officer does not violate the Fourth Amendment when he conducts a limited search for weapons, for his own protection, where there is "reason to believe that he is dealing with an armed and dangerous individual." *Id.* at 27. In reviewing the legality of such a search, we ask "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* In *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979), the Court made clear that "a reasonable belief that [an individual is] armed and presently dangerous . . . must form the predicate to a patdown of a person for weapons." The fact that an individual is present at a location where a search is taking place is not sufficient justification for a *Terry* frisk: "The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." *Id.* at 94.

The District Court did not err in concluding that the frisk of Murray was supported by reasonable suspicion that he was armed and dangerous. The officers had obtained evidence from Burns, supported by information from their investigation earlier in the day, that Murray was a drug dealer

9

who was running a prostitution operation. In light of these facts, it was reasonable to suspect that Murray was armed. *See United States v. Binion*, 570 F.3d 1034, 1039 (8th Cir. 2009) ("An officer's reasonable belief that someone is involved in drug dealing can support a suspicion that the person is armed since weapons are often present incident to the drug business."). Corporal Schwartz's limited intrusion upon Murray's personal security was supported by reasonable suspicion and within the "narrow scope" of *Terry*. *See Ybarra*, 444 U.S. at 94; *Terry*, 392 U.S. at 27; *United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) (holding that a pat-down was lawful, where an officer had testified that he was "concerned for his safety because persons involved with drugs often carry weapons").

Murray contends, however, that the frisk was unlawful because *Terry* has no application when the police-citizen encounter takes place in a home. Murray cites language from our opinion in *United States v. Myers*, 308 F.3d 251, 258 (3d Cir. 2002), in which we observed that *Terry* "has never been applied inside a home." That case, however, dealt with markedly different facts. There, an officer entered a home, arrested an individual without probable cause, and searched a bag. The government attempted to justify the search of the bag as lawful incident to a valid *Terry* search. Here, by contrast, the officers were lawfully present in a motel room (not a home) and conducted a limited pat-down search for weapons when Murray arrived unexpectedly on the scene presenting a potential threat to their safety. In *Myers*, we acknowledged that to the extent *Terry* did apply, it would "only allow the officer to exercise control over [the individual] to protect himself and secure the situation." *Id.* at 258. This is precisely what took place in Room 302. The same principles that the Supreme Court outlined *Terry*, and acknowledged in *Ybarra*, are at work here: because the officers possessed reasonable suspicion that Murray was presently armed and dangerous, their limited intrusion into his personal security by way of a frisk for the purpose of officer safety did not run afoul of the Fourth Amendment.

10

Importantly, the items taken from Murray were not seized in connection with the frisk. The District Court found, and we agree, that the items taken from Murray's pockets and from around his neck were taken pursuant to his valid consent. Although Murray testified to the contrary, Corporal Schwartz testified that he requested and received consent. In the absence of any facts to support a "definite and firm conviction that a mistake has been committed," we cannot say that the Court clearly erred in crediting Corporal Schwartz's version of events. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

## V.

Because the District Court correctly concluded that there was no Fourth Amendment violation, we will affirm the denial of Murray's motion to suppress.